## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

HANNAH HARRIS,                                    CIVIL DIVISION

               Plaintiff,                       No.

    v.

MIDAS, AUTO SYSTEMS CENTERS, INC.,
KATZ MIDAS FRANCHISES, MIDAS
AUTO SERVICE EXPERTS, MIDAS AUTO
& TIRE EXPERTS, MAX AUTO SUPPLY
COMPANY, KEN SHICK, TRENT KIGHT,
TBC CORPORATION, MIDAS, INC., and
MIDAS INTERNATIONAL
CORPORATION,

               Defendant.          **JURY TRIAL DEMANDED**

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff Hannah Harris, by and through counsel Robert A. Bracken, Esquire and the law firm of Archinaco/Bracken LLC, and files the following Complaint in Civil Action and avers as follows:

### Plaintiff

1.     Plaintiff, Hannah Harris is an adult individual with an address of 119 West 11th Avenue, Tarentum, PA 15084.

2.     Plaintiff was employed as a technician at the Midas location at 3300 Leechburg, Lower Burrell, PA 15068.

### Defendants

3.     Midas is a franchise business located at 3300 Leechburg, Lower Burrell, PA 15068.  This Midas location is a franchise owned and operated by the Katz family businesses that are identified below.  This franchise location is also known as Midas Auto Service Experts,

which has also been identified as a Defendant.   When referring specifically to the Midas franchise at which Plaintiff worked, it shall be referred to as "Lower Burrell Midas" or "Midas."

4.     Auto Systems Centers, Inc. is a for-profit corporation with a registered address of 1101 Monroe Street, Toledo, OH 43697.  Auto Systems Centers, Inc. is the Katz-family owned entity that appeared on Plaintiff's paycheck.  Auto Systems Centers, Inc. is involved with the operation and management of the Midas franchise at which Plaintiff was employed.

5.     Katz Midas Franchises is an Ohio organization with a principal place of business of 1101 Monroe Street, Toledo, OH 43697.   Katz Midas Franchises is involved with the operation and management of the Midas franchise at which Plaintiff was employed.

6.     Midas Auto Service Experts has a principal place of business of 1101 Monroe Street, Toledo, OH 43697.  Midas Auto Service Experts is also another name for the Midas franchise at which Plaintiff was employed.  Midas Auto Service Experts is involved with the operation and management of the Midas franchise at which Plaintiff was employed.

7.     Midas Auto & Tire Experts has a principal place of business of 1101 Monroe Street, Toledo, OH 43697. Midas Auto & Tire Experts is involved with the operation and management of the Midas franchise at which Plaintiff was employed.

8.     Max Auto Supply Company is a for-profit corporation with a registered address of 1101 Monroe Street, Toledo, OH 43697.  It is believed that Max Auto Supply Company, which is also owned by the Katz family, is involved with the operation and management of the Midas franchise at which Plaintiff was employed.

9.     Auto Systems Centers, Inc., Katz Midas Franchises, Midas Auto Service Experts, Midas Auto & Tire Experts and Max Auto Supply Company shall be referred to collectively as "Katz Midas."

10.     Defendant Ken Shick is an adult individual and resident of Westmoreland County with a business address of Midas, 3300 Leechburg, Lower Burrell, PA 15068. Defendant Shick was the store manager at the Lower Burrell Midas while Plaintiff was employed there. Despite the horrific and offensive conduct in which he engaged, Defendant Shick remains the store manager at the Lower Burrell Midas.

11.     Defendant Trent Kight is an adult individual with a business address of Midas Auto Service Experts, 1101 Monroe Street, Toledo, OH 43697. Defendant Kight is a district manager that oversaw several Katz Midas locations while Plaintiff was employed there and was also the supervisor of Defendant Shick. Defendant Kight remains the district manager overseeing the Lower Burrell Midas.

12.     TBC Corporation is a corporation headquartered at 4300 TBC Way, Palm Beach Gardens, FL 33410.

13.     Midas, Inc. is a corporation headquartered at 4280 Professional Center Drive, Suite 400, Palm Beach Gardens, FL 33410.

14.     Midas International Corporation is a corporation headquartered at 4280 Professional Center Drive, Suite 400, Palm Beach Gardens, FL 33410.

15.     TBC Corporation, Midas, Inc. and Midas International Corporation are the Midas parent companies and the franchisor of the Midas shop locations, including the Lower Burrell location at which Plaintiff was employed. These companies shall be referred to jointly as "Midas, Inc."

### Jurisdiction

16.     On or about July 21, 2016, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), as well as supplements to the initial

charge. The filing also constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.

17.   Plaintiff was issued Notices of Right to Sue from the EEOC.

18.   It has been more than one hundred and eighty (180) days since the filing of Plaintiff's Charge of Discrimination.

19.   Plaintiff has complied with all conditions precedent to filing this Complaint.

20.   The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617, as well as 28 U.S.C. § 1367 for Plaintiff's pendent claims.

21.   Venue is appropriate in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in Crawford County, Pennsylvania.

22.   Indeed, Plaintiff's termination occurred within the Commonwealth of Pennsylvania and, more specifically, this District.

### Factual Introduction

23.   This case involves shocking acts of sexual harassment and retaliation against the lone female technician at a Western Pennsylvania Midas location.

24.   The Midas store manager physically struck and sexually harassed Hannah Harris while encouraging such behavior from the other Midas employees, which resulted in them creating and carving a large, penis-shaped stick, which they spray painted black, and named the "Hannah Beater."

25.   Then, after Ms. Harris complained to the Midas district manager, rather than rectify the situation, he joined in on the harassment, even sending Ms. Harris lewd text messages.

26.     Even worse, however, was the retaliatory conduct of the store manager when he learned Hannah Harris sought to make reports of harassment.

27.     After learning that she sought to make reports of harassment, the store manager threatened Ms. Harris (a single mother trying to support her children) that if she made a report she would lose her job.  He then physically accosted Ms. Harris, forced her into a chair, pulled her shirt away from her body and viewed and commented on her breasts.

28.     Hannah Harris advised Midas management of the horrors imposed upon her by the store manager.

29.     Rather than protect Hannah Harris, Midas was dismissive of her claims and chose to protect its management; thus, ending her employment.

30.     Substantial compensatory and punitive damages are necessary to send the message to Midas that such offensive, outrageous and atrocious conduct is not permitted in Western Pennsylvania.

### Relationship between Franchisor and Franchisee Companies

31.     Katz Midas is the largest franchisee of Midas auto service locations in the world.

32.     Indeed, Katz Midas owns and operates approximately 115 Midas franchises of the more than 1,000 Midas locations in the United States.

33.     Resultantly, Katz Midas and Midas, Inc. are substantially intertwined in their business functions, with Katz Midas having significant clout and influence with Midas Inc.

34.     Midas, Inc. maintained the right to inspect and control the work of Katz Midas and, in particular, the Lower Burrell Midas location.

35.     In fact, representative(s) of Midas, Inc. visited and inspected the Lower Burrell Midas location to ensure that it complied with standards and requirements set by Midas, Inc.

36.     Midas, Inc. sets the appearance requirements for the Katz Midas locations.

37.     Midas, Inc. requires Katz Midas stores to have particular contents and inventory.

38.     Midas, Inc. provides national advertising campaigns for the benefit of franchisees, including Katz Midas.

39.     Midas, Inc. also sets guidelines and requirements regarding the manner in which Katz Midas operates its store with respect to pricing, advertising, record-keeping, operating hours, and uniforms.

40.     Midas, Inc. provides training to Katz Midas employees regarding automotive services.

41.     Midas, Inc. sets quality standards for Katz Midas franchises.

42.     Midas, Inc. also provides training to Katz Midas executives and upper management regarding the manner in which to operate its locations, which includes training in employee relations, compliance with anti-discrimination statutes, handling complaints of discrimination, harassment and retaliation, and setting store policies.

43.     Indeed, Midas, Inc. provides training to Katz Midas executives/upper management at its headquarters and also has a field support team of more than 40 employees that provides training and direction to franchisees, including Katz Midas, regarding business management, customer service and shop operations.

## Facts

44.     On October 23, 2015, Hannah Harris was hired as a technician at the Lower Burrell Midas location.

45.     Ken Shick is the store manager at the Lower Burrell Midas.

46.     Starting a few weeks after her employment began, Ms. Harris was repeatedly

sexually, physically and emotionally harassed, assaulted, battered and tortured by Defendant Shick.

47.     Such conduct went on through the end of Ms. Harris' employment on or about July 13, 2016.

48.     Defendant Shick grabbed Ms. Harris by the back of the neck and shoved her head down to look at brakes she mistakenly thought were worn out.  When doing so, Defendant Shick called Ms. Harris a "dumb b*tch."

49.     Defendant Shick, the store manager, thought it was funny and amusing when the assistant store manager, Mr. Machen presented a stick to Ms. Harris that was spray-painted black and carved into the shape of a penis in April 2016.

50.     Mr. Machen and other Midas employees gave the stick a name, which they carved into the stick: "Hannah Beater."

51.     They also carved the following phrases into the stick: "Long D*ck Style" and "Hannah C*nt B*tch."

52.     After Ms. Harris was upset and objected to the stick as being offensive, Mr. Machen broke the top off of the stick and threw it behind the Lower Burrell store.  Ms. Harris, however, **recovered** the damaged stick.

53.     Defendant Shick encouraged Mr. Machen and the other Midas employees to engage in such conduct and harassment.

54.     On June 6, 2016, Defendant Shick repeatedly struck Ms. Harris in the arm in anger.

55.     Defendant Shick repeatedly used offensive, discriminatory, and sexist language towards Ms. Harris.  Examples of the offensive remarks he made are included in the following paragraphs.

56.     While Ms. Harris was on the floor cleaning, Defendant Shick walked over to her, grabbed his crotch and said "well, while you're down there..." suggesting that Ms. Harris should engage in oral sex with him.

57.     Defendant Shick often called Ms. Harris a "dumb b*tch," "dumb c*nt," and would state, even in front of customers that since Ms. Harris is a woman, "she doesn't know what she's talking about."

58.     Indeed, Defendant Shick said many sexist things about Ms. Harris in front of customers.

59.     Defendant Shick told Ms. Harris that she was "asking for it from the boys" because she wore a tank top and jeans in the shop.

60.     Defendant Shick required Ms. Harris to perform job duties that other men were not expected to perform.  For example, he told Ms. Harris that it was her "womanly duty to scrub the bathroom."

61.     Defendant Shick commented about Ms. Harris' female body parts and described the sexual things he would like to do to Ms. Harris.

62.     Defendant Shick went behind Ms. Harris, put his hands on her hips, and thrusted his hips as though he was engaging in a sexual act with her.

63.     Defendant Shick opened his arms and insisted that Ms. Harris hug him while he said, "Who's your daddy?"

64.     If Ms. Harris did not acquiesce to these or other similar demands, she would be harassed throughout the day by Defendant Shick.

65.     Defendant Shick sent Ms. Harris home, which resulted in her losing pay, various times while directing his venom towards her by stating things like "take your b*tch a** home" or "go take your tampon out."   And, on other occasions, Ms. Harris would be forced to make an excuse to leave work to escape the harassment.

66.     Ms. Harris reported Defendant Shick's conduct to Defendant Kight, the district manager and Defendant Shick's immediate supervisor.

67.     Rather than reprimand Defendant Shick or even address his behavior, Defendant Kight decided it was his opportunity to harass Ms. Harris, which is what he did.

68.     Defendant Kight joined with Defendant Shick in sexually harassing Ms. Harris.

69.     Ms. Harris was subjected to the personal animus of Defendant Kight and Defendant Shick.

70.     For example, in or about early 2016, Defendant Kight got into the back of a customer's car that she was pulling out and asked, "Where are we going to f*ck?"

71.     Further, Defendant Kight also asked Ms. Harris what she looked like under her clothes because he thought she had a nice body.

72.     Additionally, throughout her employment, Defendant Shick told Ms. Harris that if she were to complain about the way she was treated he would ensure that he would have her livelihood taken from her and, resultantly, that she would lose the ability to provide for her children.

73.     On July 8, 2016, Defendant Kight called Ms. Harris while he was at the Lower Burrell Midas location drinking beer with several Midas employees, which was in violation of Katz Midas and Midas, Inc. policy.

74.     After Ms. Harris did not answer the July 8, 2016 phone call, Defendant Kight started texting Ms. Harris from another phone number.

75.     In the text messages, Defendant Kight admitted that it was he by stating, "It's your bosses boss."

76.     Defendant Kight then wrote that he thought Ms. Harris is "sexy," among other inappropriate comments, including his statement that he was the "man" that could make Ms. Harris' "toes curl."

77.     Ms. Harris responded by telling Defendant Kight that his text messages were "extremely inappropriate."

78.     Then, Ms. Harris and her boyfriend, Martin Amodeo, called the phone number that sent the text messages.

79.     Initially, each time they would call the number, it would be answered and immediately hung up.

80.     Eventually, however, Ms. Harris and Mr. Amodeo got through to the voice mail, which verified that the text messages had come from Defendant Kight.

81.     On the evening of July 8, 2016, Ms. Harris called the police and filed a report of harassment against Defendant Kight and also advised the police officer that she was being sexually harassed in the workplace.

82.     The following day, July 9, 2016, Ms. Harris asked Defendant Shick for human resource's phone number along with the company's employee handbook.

83.     Ms. Harris also advised Defendant Shick that she had filed a report of harassment against Defendant Kight with the police.

84.     Defendant Shick threatened Ms. Harris, as he had done several times in the past, and even tried to bribe Ms. Harris to not make a report.

85.     On July 9, 2016, there were several conversations between Ms. Harris and Defendant Shick some of which were in the presence of others.

86.     During an earlier conversation that day when Ms. Harris was provided the employee handbook, Defendant Shick told Ms. Harris that she is only to report Defendant Kight's conduct to him and that she should follow the chain of command.

87.     In an attempt to further intimidate Ms. Harris, Defendant Shick reminded Ms. Harris of his military background.

88.     Defendant Shick threatened Ms. Harris that if she went above his head there would be problems, including that they would scrutinize everything she does so that she loses her job.

89.     Ms. Harris was so upset that she was shaking.

90.     Defendant Shick made these threats to intimidate Ms. Harris, whom he was worried had and/or would bring harassment charges against Defendant Kight and himself.

91.     In fact, Defendant Shick's conduct terrified Ms. Harris to the point that she was informing Mr. Amodeo, her boyfriend, that she was scared.

92.     As a result, given the multiple threats and attempts to intimidate Ms. Harris, Ms. Harris had a reasonable suspicion that she would be subject to witness/victim intimidation, witness/victim retaliation and sexual assault.

93.     Accordingly, Ms. Harris was justified and permitted under Pennsylvania law to **record** the final conversation with Defendant Shick.

94.     As Ms. Harris reasonably suspected would occur, Defendant Shick did indeed threaten, intimidate and assault Ms. Harris during the final conversation he had with Ms. Harris.

95.     During this conversation, Defendant Shick stated that it was his understanding that Ms. Harris sought to bring charges of sexual harassment against not only Defendant Kight but also Defendant Shick.

96.     Defendant Shick threatened that if Ms. Harris filed a complaint or "charges," her job would be in jeopardy.

97.     Defendant Shick told Ms. Harris that she should shut her "f*cking mouth."

98.     Then, Defendant Shick began physically and sexually harassing, assaulting and battering Ms. Harris.

99.     All of Defendant Shick's conduct was done for the purpose of intimidating Ms. Harris.

100.    Defendant Shick suggested that any harassment Ms. Harris received was her fault.

101.    Defendant Shick stated that he would never hire another woman with children and no husband.

102.    Defendant Shick stated that if he was young and wanted to sleep with Ms. Harris, he would get her drunk and Ms. Harris would "spread her legs."

103.    Defendant Shick described how he had previously seen Ms. Harris' breasts "flapping in the wind" when Ms. Harris bent underneath a car.

104.    Defendant Shick threatened that if Ms. Harris ever attempted to use the fact that he saw her breasts against him, he would punch her in the nose.

105.   Defendant Shick told Ms. Harris to sit in a chair several times.

106.   The final time, Defendant Shick pushed Ms. Harris into the chair.

107.   Defendant Shick then stood over Ms. Harris and looked down her shirt.

108.   In fact, Defendant Shick, the Midas store manager, actually pulled Ms. Harris' shirt away from her body, looked at Ms. Harris' breasts and commented upon them.

109.   Ms. Harris was upset, crying and in fear while Defendant Shick was engaging in this horrific conduct.

110.   This caused Ms. Harris severe emotional distress.

111.   Defendant Shick provided sworn deposition testimony that the conduct Ms. Harris alleged occurred on July 9, 2016 did **not** occur.

112.   Instead, while under oath, Defendant Shick denied that he engaged in the conduct described on July 9, instead accusing Ms. Harris of lying about it occurring.

113.   It was not Ms. Harris that lied, however; instead it was Defendant Shick that lied repeatedly while under oath during his deposition.

114.   The testimony given by Defendant Shick was material to the proceedings.

115.   Defendant Shick repeatedly committed perjury when he lied under oath during his deposition about the events in this case and, more specifically, the events of July 9, 2016.

116.   After being abused by Shick on July 9, Ms. Harris reported the harassing conduct she endured in detail to Vice President Ian Katz and District Manager Chris Harter.

117.   Rather than remedy the problem (or even properly investigate it), Mr. Harter told Ms. Harris that she had to either return to work with the harassers, accept a transfer to an inconvenient location that was not feasible for a single mother making $9/hour, or be terminated.

118.   And, despite being told of Defendant Shick's conduct, Mr. Harter explicitly told Ms. Harris: "Ken will not be moved."

119.   Mr. Harter made this conclusion after conducting no investigation whatsoever, as he and Midas' management were not only entirely dismissive of Ms. Harris' allegations, but also complicit in it.

120.   In other words, the very people that Ms. Harris should have been protected by instead assisted in and were complicit in creating a scenario where Ms. Harris had to agree to be terminated and/or constructively terminated.

121.   As no reasonable person could return to work with the harassers described herein, and a transfer was not economically feasible, Ms. Harris accepted termination.

122.   Indeed, no reasonable person would continue to work for this company; as such, Ms. Harris was, at the very least, constructively terminated.

123.   Thereafter, Ms. Harris was subjected to further retaliation.

124.   Knowing that Ms. Harris' revelations would be devastating to the Defendants, Defendants engaged in a course of retaliatory conduct designed to dissuade Ms. Harris from making further reports of sexual harassment and/or taking action with the EEOC or other government entities.

125.   Indeed, under the guise of purported settlement negotiations, Midas sent a letter advising Ms. Harris of the various awful, vile lies they intend to spew if she pursued her case, including fabrications that Ms. Harris was a prostitute.

126.   This was done as an act of retaliation meant solely to dissuade Ms. Harris from pursuing her claims.

127.    Midas' scheme nearly worked, as it caused Ms. Harris (who Midas knew to be emotionally and mentally fragile with a tragic background) to suffer anxiety, shake uncontrollably and even call a suicide hotline to help deal with stress.

128.    Ms. Harris has suffered several physical ailments as a result of the conduct set forth throughout this complaint.

**129.**    Thus, Defendants' extreme and outrageous conduct warrants the imposition of substantial compensatory damages and the most severe punitive damages available under the law.

## COUNT I
### Sexual Harassment

*Plaintiff v. Midas, Auto Systems Centers, Inc., Katz Midas Franchises, Midas Auto Service Experts, Midas Auto & Tire Experts, Max Auto Supply Company, TBC Corporation, Midas, Inc., and Midas International Corporation*

130.    Plaintiff incorporates by reference herein Paragraphs 1 through 129 of the Complaint as if more fully set forth at length herein.

131.    Defendants' conduct described above and herein constitutes sexual harassment and is a violation of Title VII.

132.    Defendants' discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

133.    The conduct described had the purpose or effect of unreasonably interfering with Plaintiff's work performance and/or creating an intimidating, hostile or offensive work environment.

134.    The conduct described above and herein was unlawful sexual discrimination committed by Defendants' employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to firing.

135.    As a direct and proximate result of Defendants' unlawful, willful, deliberate harassment and discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, medical expenses, adverse effects on her career and diminished earning capacity.

136.    As a direct and proximate result of Defendants' unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems including but not limited to emotional distress and anxiety.

137.    By reason of Defendants' unlawful, willful, outrageous and deliberate misconduct towards Plaintiff, Plaintiff is entitled to recover both compensatory and punitive damages in addition to actual damages.

138.    As a result of Defendants' discriminatory conduct, Plaintiff is entitled to all available damages pursuant to Title VII, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendant in an amount in excess of $75,000 with attorneys' fees and costs assessed, and any other relief or damages deemed proper by the Court.

## COUNT II
### Gender Discrimination

*Plaintiff v. Midas, Auto Systems Centers, Inc., Katz Midas Franchises, Midas Auto Service Experts, Midas Auto & Tire Experts, Max Auto Supply Company, TBC Corporation, Midas, Inc., and Midas International Corporation*

139.    Plaintiff incorporates by reference herein Paragraphs 1 through 138 of the Complaint as if more fully set forth at length herein.

140.    Defendants' conduct described above and herein constitutes gender / sex discrimination and is a violation of Title VII.

141.    Defendants' discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

142.    The conduct described above and herein was unlawful gender / sex discrimination committed by Defendants' employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to firing and denial of income.

143.    As a direct and proximate result of Defendants' unlawful, willful, deliberate discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, medical expenses, adverse effects on her career and diminished earning capacity.

144.    As a direct and proximate result of Defendants' unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems including but not limited emotional distress and anxiety.

145.    As a result of Defendants' discriminatory conduct, Plaintiff is entitled to all available damages pursuant to Title VII, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendants in an amount in excess of $75,000 with attorneys' fees and costs assessed, and any other relief or damages deemed proper by the Court.

## COUNT III
### Hostile Work Environment

*Plaintiff v. Midas, Auto Systems Centers, Inc., Katz Midas Franchises, Midas Auto Service Experts, Midas Auto & Tire Experts, Max Auto Supply Company, TBC Corporation, Midas, Inc., and Midas International Corporation*

146.    Plaintiff incorporates by reference herein Paragraphs 1 through 145 of the Complaint as if more fully set forth at length herein.

147.    Defendants' conduct described above and herein constitutes discrimination.

148.    The conduct described above and herein was unwelcome and unwanted.

149.    The conduct described had the purpose or effect of unreasonably interfering with Plaintiff's work performance and/or creating an intimidating, hostile or offensive work environment.

150.    The unwelcome and unlawful conduct was both subjectively abusive to Plaintiff and also objectively severe and pervasive enough to create a work environment that a reasonable person would find abusive.

151.    Such conduct, as described above and herein, was frequent, severe, pervasive, physically threatening and humiliating, interfered with work performance, had an adverse effect of Plaintiff's psychological well-being and was conducted by harassers who were superior in the organization.

152.    As a direct and proximate result of Defendants' unlawful, willful, deliberate harassment and discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, medical expenses, adverse effects on her career and diminished earning capacity.

153.    As a direct and proximate result of Defendants' unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems including emotional distress and anxiety.

154.    By reason of Defendants' unlawful, willful, outrageous and deliberate misconduct towards Plaintiff, Plaintiff is entitled to recover both compensatory and punitive damages in addition to actual damages.

155.    As a result of Defendants' discriminatory conduct, Plaintiff is entitled to all available damages pursuant to Title VII, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendant in an amount in excess of $75,000 with attorneys' fees and costs assessed, and any other relief or damages deemed proper by the Court.

## COUNT IV
### Unlawful Retaliation

*Plaintiff v. Midas, Auto Systems Centers, Inc., Katz Midas Franchises, Midas Auto Service Experts, Midas Auto & Tire Experts, Max Auto Supply Company, TBC Corporation, Midas, Inc., and Midas International Corporation*

156.    Plaintiff incorporates by reference herein Paragraphs 1 through 155 of the Complaint as if more fully set forth at length herein.

157.    Defendants' conduct described above and herein constitutes retaliation, in violation of the law, including Title VII.

158.    Defendants' retaliation against Plaintiff was the result of her objecting to the outrageous, offensive conduct set forth throughout the complaint.

159.    Specifically, Defendant retaliated against Plaintiff by engaging in the following acts:

      (a)    terminating and/or constructively terminating Plaintiff;

      (b)    subjecting Plaintiff to continued abusive, harassing conduct;

      (c)    threatening to defame and disparage Plaintiff with lies if she pursued this lawsuit; and

      (d)    as otherwise set forth in the Complaint.

160.    As a direct and proximate result of Defendants' unlawful, willful, deliberate retaliation against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, medical expenses, adverse effects on her career and diminished earning capacity.

161.    As a direct and proximate result of Defendants' unlawful, willful and deliberate retaliation against Plaintiff, Plaintiff suffered from physical problems including emotional distress and anxiety.

162.    As a result of Defendants' retaliatory conduct, Plaintiff is entitled to all available damages, including but not limited to damages for the following:  (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; (4) attorneys' fees and costs; and (5) punitive damages

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendant in an amount in excess of $75,000 with attorneys' fees and costs assessed, and any other relief or damages deemed proper by the Court.

## COUNT V
## Assault and Battery

*Plaintiff v. Midas, Auto Systems Centers, Inc., Katz Midas Franchises, Midas Auto Service Experts, Midas Auto & Tire Experts, Max Auto Supply Company, Ken Shick, TBC Corporation, Midas, Inc., And Midas International Corporation*

163.    Plaintiff incorporates by reference Paragraphs 1 through 162 of her Complaint as if set forth in their entirety herein.

164.    As set forth in detail throughout this complaint, Defendant Shick, in the course and scope of his employment, engaged in unwanted touching of Ms. Harris with the desire to cause harmful or offensive contact to Ms. Harris.

165.    In so doing, Defendant Shick also intended to cause a reasonable apprehension of immediate harmful and offensive contact to Ms. Harris.

166.    As a result of Defendant Shick's wrongful conduct, Ms. Harris sustained physical, mental and emotional injuries.

167.    During her employment and even after, Defendant Shick's conduct caused Ms. Harris to become physically ill and cry, tremble, lose sleep as well as suffer other physical and emotional manifestations of anxiety and distress.

168.    Further, Defendant Shick's unwanted physical touching caused Ms. Harris physical pain and suffering in addition to emotional pain and suffering.

169.    Additionally, Defendant Shick's conduct, in whole or in part, was evidence of his personal animus towards Ms. Harris.

170.    As a direct and proximate result of the aforementioned injuries, Ms. Harris has sustained damages, including but not limited to the following: loss of earnings; past, present and future physical and mental pain, suffering and inconvenience; medical expenses; impairment of

Plaintiff's general health, strength and vitality; loss of feeling of wellbeing; worry, anxiety, apprehension and frustration; and undue mental anguish.

171.    Further, Defendant Shick's conduct was reckless, outrageous, willful, wanton, and intentional; thus, punitive damages are warranted.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount in excess of the prevailing arbitration limits, exclusive of prejudgment interest, post-judgment interest and costs.

**COUNT VI**
**Intentional Infliction of Emotional Distress**

***Plaintiff v. All Defendants***

172.    Plaintiff incorporates by reference Paragraphs 1 through 171 of her Complaint as if set forth in their entirety herein.

173.    As set forth in detail throughout this complaint, Defendant Shick, in the course and scope of his employment, intentionally physically, mentally and emotionally abused Ms. Harris.

174.    Defendant Kight also engaged in conduct designed to intentionally inflict emotional distress upon Ms. Harris.

175.    In addition to the fact that Defendants inflicted such emotional distress, Defendants' conduct was even more outrageous, as defendants were aware that Ms. Harris had a tragic past.

176.    Thus, Defendant Shick and Defendant Kight not only engaged in extreme and outrageous conduct that intentionally and recklessly caused Ms. Harris severe emotional distress, but they did so while knowing about Ms. Harris' prior problems – ones that they sought to intentionally exploit while abusing her.

177.    Defendant Shick's and Defendant Kight's conduct went beyond all possible bounds of decency and is utterly intolerable in a civilized society.

178.    As a result of such conduct, Plaintiff suffered from emotional distress, mental anguish, nervous shock, embarrassment, shame and humiliation.

179.    During her employment and even after, Defendant Shick's conduct caused Ms. Harris to become physically ill and cry, tremble, lose sleep as well as suffer other physical and emotional manifestations of anxiety and distress.

180.    As a direct and proximate result of the aforementioned injuries, Plaintiff has sustained damages, including but not limited to the following: loss of earnings; past, present and future physical and mental pain, suffering and inconvenience; medical expenses; impairment of Plaintiff's general health, strength and vitality; loss of feeling of wellbeing; worry, anxiety, apprehension and frustration; and undue mental anguish.

181.    Further, this conduct was reckless, outrageous, willful, wanton, and intentional; thus, punitive damages are warranted.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount in excess of the prevailing arbitration limits, exclusive of prejudgment interest, post-judgment interest and costs.

**COUNT VII**
**Invasion of Privacy - Intrusion Upon Seclusion**

***Plaintiff v. Midas, Auto Systems Centers, Inc., Katz Midas Franchises, Midas Auto Service Experts, Midas Auto & Tire Experts, Max Auto Supply Company, Ken Shick, TBC Corporation, Midas, Inc., And Midas International Corporation***

182.    Plaintiff incorporates by reference Paragraphs 1 through 181 of her Complaint as if set forth in their entirety herein.

183.    Defendant Shick physically intruded upon the seclusion and private concerns of Ms. Harris.

184.    Ms. Harris had a right to privacy with respect to her private body parts, including her breasts, which were clothed and were not exhibited to the public.

185.    Yet, Defendant Shick pushed Ms. Harris into a chair, pulled her shirt away from her body and looked at her breasts while he commented upon them.

186.    This conduct was an intrusion upon Ms. Harris' seclusion and private concerns.

187.    This intrusion was substantial and highly offensive to a reasonable person.

188.    As a result of such conduct, Plaintiff suffered from emotional distress, mental anguish, nervous shock, embarrassment, shame and humiliation.

189.    During her employment and even after, Defendant Shick's conduct caused Ms. Harris to become physically ill and cry, tremble, lose sleep as well as suffer other physical and emotional manifestations of anxiety and distress.

190.    As a direct and proximate result of the aforementioned injuries, Plaintiff has sustained damages, including but not limited to the following: loss of earnings; past, present and future physical and mental pain, suffering and inconvenience; impairment of Plaintiff's general health, strength and vitality; loss of feeling of wellbeing; worry, anxiety, apprehension and frustration; and undue mental anguish.

191.    Further, this conduct was reckless, outrageous, willful, wanton, and intentional; thus, punitive damages are warranted.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount in excess of the prevailing arbitration limits, exclusive of prejudgment interest, post-judgment interest and costs.

24

## PENNSYLVANIA HUMAN RELATIONS ACT

192.    Plaintiff incorporates by reference herein Paragraphs 1 through 191 of the Complaint as if more fully set forth at length herein.

193.    Plaintiff intends to assert an eighth cause of action.

194.    Plaintiff will request leave to amend to bring a cause of action under the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. against all defendants, to secure full restitution of all wages and benefits resulting from Defendant's violation of the provision of the Pennsylvania Human Relations Act and for such other and further relief as may be appropriate upon the exhaustion of administrative remedies to the extent that the PHRA claims are not resolved before the PHRC.

195.    Jurisdiction of this action will be based on the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

196.    Plaintiff's filings with the EEOC constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.

197.    Accordingly, Plaintiff will move to amend the complaint to affirmatively assert PHRA claims premised upon Defendants' harassment, discrimination and retaliation of Plaintiff upon the exhaustion of administrative remedies.

**JURY TRIAL DEMANDED**

Respectfully submitted,

Date: <u>January 19, 2017</u>

ARCHINACO / BRACKEN LLC

By

Robert A. Bracken
PA ID 206095
The Pennsylvanian, Suite C-6
1100 Liberty Avenue
Pittsburgh, PA 15222
(412) 434-0555
***Counsel for Plaintiff***