**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HANNAH HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 17-95 |
| | ) | |
| v. | ) | |
| | ) | Judge Cathy Bissoon |
| MIDAS, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

**I.      MEMORANDUM**

Pending before the Court are Motions to Dismiss filed by Defendants Midas International

Corporation, Midas, Inc., and TBC Corporation (collectively, the "TBC Defendants") (**Doc. 7**)

and Defendants Auto Systems Centers, Inc., Katz Midas Franchises, Trent Knight, Max Auto

Supply Company, Midas, Midas Auto & Tire Experts, Midas Auto Service Experts, Midas

International Corporation, Midas, Inc., Ken Shick, and TBC Corporation (collectively, the

"Defendants") (**Doc. 10**), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For

the reasons that follow, the TBC Defendants' Motion to Dismiss (**Doc. 7**) will be GRANTED

and Defendants' Partial Motion to Dismiss (**Doc. 10**) will be DENIED.

**A.  DEFENDANTS' PARTIAL MOTION TO DISMISS**

**a.  Factual Background**

The Court will first consider Defendants' Partial Motion to Dismiss (Doc. 10).  The Court

writes principally for the parties, who are familiar with the factual context and legal history of

this case.  Therefore, it will set forth only those allegations that are necessary to its analysis.

According to the Complaint, Plaintiff Hannah Harris ("Plaintiff" or "Harris") worked as a

technician at the Lower Burrell Midas location where Defendant Ken Shick was and still is the

store manager. Compl. (Doc. 1) at ¶¶ 1-2, 10. Throughout her less than one-year employment with Midas, Harris alleges that she was "repeatedly sexually, physically and emotionally harassed, assaulted, and tortured by Defendant Shick." <u>Id.</u> at ¶¶ 46-47.

Examples of the conduct that Harris alleges she was subjected to by Shick and other Midas managers include the following:

(1)     Shick grabbed Harris by the back of the neck and shoved her head down to look at brakes she mistakenly thought were worn out. When doing so, Shick called Harris a "dumb b*tch." (<u>Id.</u> at ¶ 48).

(2)     In April 2016, Assistant Store Manager, Justin Machen presented a stick to Harris that was spray-painted black and carved into the shape of a penis. Mr. Machen and other Midas employees gave the stick a name, which they carved into the stick: "Hannah Beater." They also carved the following phrases into the stick: "Long D*ck Style" and "Hannah C*nt B*tch." Shick encouraged Mr. Machen and the other Midas employees to engage in such conduct. (<u>Id.</u> at ¶¶ 49-53).

(3)     On June 6, 2016, Shick repeatedly struck Harris in the arm in anger. (<u>Id.</u> at ¶ 54).

(4)     While Harris was on the floor cleaning, Shick walked over to her, grabbed his crotch and said "well, while you're down there..." suggesting that Harris should engage in oral sex with him. (<u>Id.</u> at ¶ 56).

(5)     Shick often called Harris a "dumb b*tch," "dumb c*nt," and would state, even in front of customers, that since Harris is a woman, "she doesn't know what she's talking about." (<u>Id.</u> at ¶ 57).

(6)     Shick told Harris that she was "asking for it from the boys" because she wore a tank top and jeans in the shop. (<u>Id.</u> at ¶ 59).

(7)     Shick required Harris to perform job duties that other men were not expected to perform. For example, he told Harris that it was her "womanly duty to scrub the bathroom." (<u>Id.</u> at ¶ 60).

(8)     Shick commented about Harris's female body parts and described the sexual things he would like to do to Harris. (<u>Id.</u> at ¶ 61).

(9)     Shick went behind Harris, put his hands on her hips, and moved his hips as though he was engaging in a sexual act with her. (<u>Id.</u> at ¶ 62).

(10)    Shick opened his arms and insisted that Harris hug him while asking, "Who's your daddy?" If Harris did not acquiesce to these or similar demands, she would be harassed throughout the day by Shick. (<u>Id.</u> at ¶¶ 63-64).

(11)    Shick sent Harris home, which resulted in her losing pay, various times while stating things like "take your bitch a** home" or "go take your tampon out." And, on other occasions, Harris would be forced to make an excuse to leave work to escape the harassment. (<u>Id.</u> at ¶ 65).

Throughout her employment, Shick told Harris that "if she were to complain about the way she was treated he would have her livelihood taken from her and, resultantly, that she would lose the ability to provide for her children." Id. at ¶ 72.

Plaintiff reported Defendant Shick's conduct to Defendant Trent Kight, the district manager and Defendant Shick's immediate supervisor. Id. at ¶ 66. Rather than reprimand Shick, Kight joined him in sexually harassing Plaintiff. Id. at ¶¶ 67-68. For example, in or about early 2016, Defendant Kight got into the back of a customer's car that Harris was pulling out and asked, "Where are we going to f*ck?" Id. at ¶ 70. Further, Defendant Kight asked Harris what she looked like under her clothes because he thought she had a nice body. Id. at ¶ 71.

On July 8, 2016, Defendant Kight called Harris while he was at the Lower Burrell Midas location drinking beer with several Midas employees. Id. at ¶ 73. After Harris did not answer, Kight started texting Harris from another phone number. Id. at ¶ 74. In the text messages, Kight admitted, "It's your bosses boss." Id. at ¶ 75. Kight then wrote that he thinks Harris is "sexy," among other inappropriate comments. Id. at ¶ 76. Harris responded by telling Kight that his text messages were "extremely inappropriate." Id. at ¶ 77. Later that evening, Harris filed a police report against Kight and also advised the police that she was being sexually harassed in the workplace. Id. at ¶ 81.

On July 9, 2016, Harris asked Shick for the employee handbook and human resources' phone number. Id. at ¶ 82. Harris also advised Shick that she had filed a criminal complaint against Kight the night before. Id. at ¶ 83. Shick told Harris that she should only report Kight's conduct to Shick. Id. at ¶ 86. In an attempt to further intimidate Harris, Shick reminded her of his military background. Id. at ¶ 87. In addition, Shick threatened Harris that if she went above his head, she would lose her job. Id. at ¶ 88. Harris was so upset that she was shaking. Id. at

¶ 89. Plaintiff alleges that Shick made these threats to intimidate Harris because he was worried she had or would bring criminal charges against him and Kight. Id. at ¶ 90.

During their final conversation regarding this matter, which Harris implies that she recorded, Shick threatened, intimidated and assaulted Harris. Id. at ¶ 94. Among other things, Shick stated that it was his understanding that Harris sought to bring charges of sexual harassment against not only Kight but also Shick. Id. at ¶ 95. Shick threatened that if Harris filed a complaint or "charges," her job would be in jeopardy. Id. at ¶ 96. Shick told Harris that she should shut her "f*cking mouth." Id. at ¶ 97. Shick then suggested that any harassment Harris received was her fault. Id. at ¶ 100. Shick stated that he would never hire another woman with children and no husband. Id. at ¶ 101. Shick stated that if he was young and wanted to sleep with Harris, he would get her drunk and Harris would "spread her legs." Id. at ¶ 102. Shick described how he had previously seen Harris's breasts "flapping in the wind" when Harris bent underneath a car. Id. at ¶ 103. Shick threatened that if Harris ever attempted to use the fact that he saw her breasts against him, he would punch her in the nose. Id. at ¶ 104. Shick then told Harris to sit in a chair several times. Id. at ¶ 105. The final time Shick pushed Harris into the chair. Id. at ¶ 106. Shick then stood over Harris and looked down her shirt. Id. at ¶ 107. Shick actually pulled Harris's shirt away from her body, looked at Harris's breasts and commented upon them. Id. at ¶ 108. Harris was upset, crying and in fear, and alleges that Shick's conduct caused her severe emotional distress. Id. at ¶¶ 109-110.

Thereafter, Harris reported Shick's harassing conduct in detail to Vice President Ian Katz and District Manager Chris Harter. Id. at ¶ 116. Harter told Harris that she had to either return to work with the harassers, accept a transfer to an inconvenient location, or be terminated. Id. at ¶ 117. Despite being told of Defendant Shick's conduct, Harter explicitly told Harris: "Ken will

not be moved." Id. at ¶ 118. Because a transfer was not economically feasible, Harris accepted termination. Id. at ¶ 121. Harris claims, at the very least, that she was constructively terminated. Id. at ¶ 122.

On August 16, 2016, counsel for Defendants sent a letter to Plaintiff, which Defendants attach to their Motion to Dismiss. Id. at ¶ 125; see Doc. 10, Exhibit A. According to Plaintiff, the letter was sent as an act of retaliation meant solely to dissuade Harris from pursuing her claims. Doc. 1 at ¶ 126. Defendants' actions caused Harris (who Midas knew to be emotionally and mentally fragile) to suffer from anxiety, shake uncontrollably and even call a suicide hotline to help deal with stress. Id. at ¶ 127. In addition, Harris has suffered several physical ailments as a result of Defendants' alleged conduct. Id. at ¶ 128.

### b. **Analysis**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When faced with a motion to dismiss, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

### i. **Dismissal of Intentional Tort Claims Based on the Worker's Compensation Act**

Defendants argue that Plaintiff's intentional tort claims should be dismissed because the claims are barred by the Pennsylvania Worker's Compensation Act ("PWCA"). The PWCA "'provides the exclusive remedy for all employees' work-related injuries.'" Jackson v. Lehigh Valley Physicians Group, 2009 WL 229756, *6 (E.D. Pa. 2009) (citation omitted). "However, the statute recognizes a limited exception, known as the 'personal animus' or 'third party attack'

exception, which permits claims for 'employee injuries caused by the intentional conduct of third parties for reasons personal to the tortfeasor and not directed against him as an employee or because of his employment.'" <u>Id.</u> (quotations and citations omitted). "The 'critical inquiry in determining the applicability of the third-party attack exception is whether the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship.'" <u>Id.</u> (quotations and citations omitted); <u>see also</u> <u>Durham Life Ins. Co., v. Evans</u>, 166 F.3d 139, 160 (3d Cir. 1999) ("The worker's compensation law excepts from its preemptive scope employee injuries caused by the intentional conduct of third parties for reasons *personal to the tortfeasor and not directed against him as an employee or because of his employment*.") (emphasis added).

Here, the Court agrees with Defendants that, with the exception of the text messages she received from Defendant Kight after work, most of the alleged harassment occurred in Plaintiff's workplace. Nevertheless, the Court concludes that there remain issues of fact as to whether Defendants Shick and Kight's conduct was personal in nature and sufficiently disconnected from any legitimate employer-employee relationship for Plaintiff's claims to fit within the exception to the PWCA. As Plaintiff argues, for example, the alleged assault she sustained on July 9, 2016, when Defendant Shick forced her into a chair, pulled away her shirt and looked at her breasts, is not conduct that one can or should expect in the workplace. <u>See</u> <u>Jackson</u>, 2009 WL 229756, at *8 (finding that a physical assault by a co-worker, though taking place at work and during work hours, "was not closely tied to any work-related activities" and "did not occur in the commission of [plaintiff's] job duties," and thus "could not reasonably 'be expected in the workplace.'").

Furthermore, Plaintiff alleges that Shick's conduct was personal in nature, as he sought, in part, to intimidate Harris from pressing charges of harassment against him and Defendant Kight. Doc. 1 at ¶¶ 84, 90, 95, 99; see also id. at 169 ("Defendant Shick's conduct, in whole or in part, was evidence of his personal animus toward Ms. Harris.")). Although Defendants argue that the Court "need not accept" Plaintiff's inference that "Shick's conduct was personal in nature," (see Doc. 23 at 2), the Court finds that the question of an alleged harasser's intent is inherently fact intensive, and if an intentional tort claim is properly pled, the issue of intent should be reserved for the trier of fact. Jackson, 2009 WL 229756, at *9. At this early stage of litigation, Plaintiff has alleged sufficient facts to show that the threats and assault she faced at work were the result of Defendant Shick's and Kight's personal animus against her. Therefore, her intentional tort causes of action are not barred by the PWCA.

### ii. Dismissal of IIED Claim Based on Failure to Allege Extreme and Outrageous Conduct

Defendants further argue that Plaintiff's intentional infliction of emotional distress (IIED) claim should be dismissed because, according to Defendants, Shick's conduct was not extreme and outrageous. The Court, quite frankly, finds this argument astonishing and wholly without merit. Without reciting the distressing allegations once again, finds that Shick's alleged conduct clearly "go[es] beyond all possible bounds of decency," is "regarded as atrocious," and is "utterly intolerable in a civilized society," see Hoy v. Angelone, 554 Pa. 134, 720 A.2d 745 (Pa. 1998).

The Court specifically rejects Defendants' argument that Plaintiff does not state an IIED claim because she has not alleged that she suffered any "adverse employment action whatsoever." Doc. 23 at 3. To the contrary, Plaintiff alleges that she suffered both threats of physical injury and an actual physical assault in retaliation for reporting to Shick that Kight

sexually harassed her. <u>Hoy</u>, 554 Pa. at 152 ("[A]s a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for the intentional infliction of emotional distress. . . The extra factor that is generally required is retaliation . . . ."). Among other things, Plaintiff alleges that, when she reported Kight's conduct to Shick, Shick reminded her of his military status, threatened to punch her in the nose, implied that he would rape her (stating that, if he wanted to sleep with her, he would "get her drunk" and she would "spread her legs"), and then pushed her into a chair, pulling her shirt away from her body, and looked at her breasts. Doc. 1 at ¶¶ 87, 102, 104-108. Courts in Pennsylvania have long held that a retaliatory threat of physical injury—let alone an actual physical assault—may support a claim for IIED. <u>See</u> <u>Denton v. Silver Stream Nursing & Rehab. Ctr.</u>, 739 A.2d 571, 577-78 (Pa. Super. Ct. 1999) (holding that a plaintiff stated an IIED claim where plaintiff alleged facts supporting an inference that her employer supported and condoned death threats against her in retaliation for her aid of an external investigation and her refusal to resign her employment).

Thus, the Court finds that Plaintiff certainly has alleged sufficient facts to state a viable IIED claim.

### iii. Dismissal of Intrusion Upon Seclusion Claim

Defendants next argue that Plaintiff failed to plead a viable intrusion upon seclusion invasion of privacy claim because the alleged wrongful conduct at issue occurred in a public workplace.

As both parties agree, courts in Pennsylvania rely on the Restatement (Second) of Torts in analyzing intrusion upon seclusion claims. <u>Tagouma v. Investigative Consultant Servs., Inc.</u>, 4 A.3d 170, 174 (Pa. Super. 2010). The Restatement defines the tort of intrusion upon seclusion as follows: "One who intentionally intrudes, physically or otherwise, upon the solitude or

seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." (citing Restatement (Second) of Torts § 652B). Comment C of that section further provides: "Even in a public place, . . . there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters." Relying on the language in the Restatement, courts have held that viewing an individual's private body parts without his or her consent can constitute an intrusion upon seclusion. See, e.g., Borton v. Unisys Corp., 1991 WL 915, at *9 (E.D. Pa. Jan. 4, 1991) ("[I]t is apparent that liability attaches . . . when a photograph is taken of a part of a person's body which he or she would ordinarily not reveal to the public."); Hidey v. Ohio State Highway, 689 N.E.2d 89, 92 (Ohio Ct. App. 1996) (relying upon Comment C to Section 652B in finding that "What is underneath her clothing is private and a part of appellant's seclusion. The intrusion upon these private matters . . . would be highly offensive to a reasonable person and, indeed, appellant averred that such acts caused her humiliation.").

Here, Plaintiff alleges that Shick forced her into a chair, pulled her shirt away from her body, looked at her breasts and commented on them. Doc. 1 at ¶¶ 105-108. Taking these allegations as true, the Court finds that Plaintiff has adequately stated a claim for intrusion upon seclusion.

#### iv. Dismissal of Retaliation Claim to the Extent it is Based on Defendants' Response to a Settlement Demand

Finally, Defendants challenge Plaintiff's retaliation claim to the extent it relies on Defendants' August 16, 2016 settlement letter,[1] stating that the letter is not admissible under Federal Rule of Evidence 408.  As Plaintiff argues, however, "statements made during settlement negotiations are admissible 'when offered for another purpose,' Fed. R. Evid. 408(b), such as to establish 'an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence.'"  Spence v. Foxx, 159 F. Supp. 3d 483, 501 n.9 (D.N.J. 2014) (citing Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998)); accord Reifsteck v. Paco Bldg. Supply Co., 2005 WL 2674941 (E.D. Mo. 2005) (finding that defendant's act of terminating plaintiff during an EEOC mediation was admissible, explaining that "[i]f such evidence was kept from a jury it would enable employers to retaliate against employees in the guise of mediation and settlement negotiations."); UFORMA/Shelby Bus. Forms, Inc. v. NLRB, 111 F.3d 1284, 1293-1294 (6th Cir. 1997) (in unfair labor practice proceeding, evidence that during settlement discussions, management personnel threatened to retaliate for employees' engaging in protected activity was admissible).

Here, because Plaintiff does not rely on the August 16, 2016 settlement letter to prove Defendants' liability for claims pre-dating that communication, the Court finds that it is not barred by Rule 408.  The Court notes, however, that in so ruling, it takes no position as to whether the August 16, 2016 settlement letter alone gives rise to an independent claim of

---

[1] Defendants attach a copy of the letter to their Motion to Dismiss.  Because Plaintiff specifically references the letter in her Complaint, see Doc. 1 ¶¶ 125-126, the Court can consider its contents. Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

retaliation. Given that Plaintiff's claim of retaliation is based on a number of allegations (see Doc. 1 at ¶ 159), which, when combined, do state a viable claim of retaliation, the Court finds that it need not reach this question.

For the reasons stated above, the Court will deny Defendants' Partial Motion to Dismiss (Doc. 10).

## B. TBC DEFENDANTS' MOTION TO DISMISS

### a. Factual Background

The Court will next consider the TBC Defendants' Motion to Dismiss (Doc. 7). The only allegations related to these Defendants are found in Paragraphs 31-43 of the Complaint. Those allegations are as follows:

31.  Katz Midas is the largest franchisee of Midas auto service locations in the world.

32.  Indeed, Katz Midas owns and operates approximately 115 Midas franchises of the more than 1,000 Midas locations in the United States.

33.  Resultantly, Katz Midas and Midas, Inc. are substantially intertwined in their business functions, with Katz Midas having significant clout and influence with Midas Inc.

34.  Midas, Inc. maintained the right to inspect and control the work of Katz Midas and, in particular, the Lower Burrell Midas location.

35.  In fact, representative(s) of Midas, Inc. visited and inspected the Lower Burrell Midas location to ensure that it complied with standards and requirements set by Midas, Inc.

36.  Midas, Inc. sets the appearance requirements for the Katz Midas locations.

37.  Midas, Inc. requires Katz Midas stores to have particular contents and inventory.

38.  Midas, Inc. provides national advertising campaigns for the benefit of franchisees, including Katz Midas.

39.  Midas, Inc. also sets guidelines and requirements regarding the manner in which Katz Midas operates its store with respect to pricing, advertising, record-keeping, operating hours, and uniforms.

40.  Midas, Inc. provides training to Katz Midas employees regarding automotive services.

41.  Midas, Inc. sets quality standards for Katz Midas franchises.

42. Midas, Inc. also provides training to Katz Midas executives and upper management regarding the manner in which to operate its locations, which includes training in employee relations, compliance with anti-discrimination statutes, handling complaints of discrimination, harassment and retaliation, and setting store policies.

43. Indeed, Midas, Inc. provides training to Katz Midas executives/upper management at its headquarters and also has a field support team of more than 40 employees that provides training and direction to franchisees, including Katz Midas, regarding business management, customer service and shop operations.

See Doc. 1 at ¶¶ 31-43. In addition, allegation number 4 states that Auto Systems Center, Inc. (a Katz-family owned entity and not one of the TBC Defendants), is the entity that appeared on Plaintiff's paychecks. Id. ¶ 4.

Defendants also attach two documents to their motion to dismiss: an affidavit of Ian M. Katz (Doc. 7-1, Exhibit A), and the Franchise Agreement between Midas International Corporation and the Lower Burrell franchise (Doc. 7-1, Exhibit 1). However, the Court will not consider these documents in deciding the Motion to Dismiss, as Plaintiff did not directly refer to either the Franchise Agreement or Mr. Katz's affidavit in her Complaint. Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 284 (3d Cir. 1991).

### b. **Analysis**

#### i. **Plaintiff's Joint Employer Theory of Liability**

Because only employers can be liable for discrimination claims under Title VII, Plaintiff must plead sufficient facts to allege that the TBC Defendants are in fact her employer. To this end, Plaintiff relies on the doctrine of joint employer liability. In the Third Circuit, "a joint employer relationship may exist for the purposes of Title VII when 'two entities exercise significant control over the same employees.'" Myers v. Garfield & Johnson Enters., Inc., 679 F.Supp.2d 598, 607 (E.D. Pa. 2010) (citing Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997)). District courts within this Circuit consider three factors in determining whether a joint

employment relationship exists: (1) the alleged employer's authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (2) the alleged employer's day-to-day supervision of employees, including employee discipline; and (3) the alleged employer's control of employee records, including payroll, insurance, taxes and the like. Butterbaugh v. Chertoff, 479 F. Supp. 2d 485, 494 (W.D. Pa. 2007). No single factor is dispositive and a weak showing on one factor may be offset by a strong showing on the other two. Id. at 496-97.

In arguing for joint employer liability, Plaintiff relies almost exclusively on the case Myers v. Garfield & Johnson Enters, 679 F. Supp. 2d 598 (E.D. Pa. 2010). In Myers, the plaintiff, an employee of a Jackson Hewitt franchise called Garfield & Johnson ("G&J"), alleged that she was sexually harassed, assaulted and threatened by a manager of the franchisee. Id. Applying the factors set out above, the Myers court found that the plaintiff had alleged sufficient facts to establish a joint employment relationship with Jackson Hewitt. Id. at 607-611. As discussed below, however, the Court finds that the facts in Myers are distinguishable from those alleged here.

Regarding the first factor, the Myers court found that the plaintiff pled facts "suggesting that Jackson [Hewitt] has the authority to 'promulgate work rules' and 'set the conditions of employment,'" because the plaintiff alleged she was covered by Jackson Hewitt's sexual harassment and other workplace policies and because Jackson Hewitt had the authority to require G&J managers to submit to training and to obey all applicable laws. Myers, 679 F. Supp. 2d at 609-10. The court also relied on the fact that Jackson Hewitt's Code of Conduct requires franchisees to fire employees in certain circumstances as evidence that Jackson Hewitt maintained significant control over hiring and firing decisions. Id.

Here, in contrast, Plaintiff has not alleged that the TBC Defendants had any authority regarding hiring and firing decisions or that she was subject to any of the TBC Defendants' workplace policies. Plaintiff does allege that the TBC Defendants provided various trainings for Katz Midas executives and upper management, including discrimination and harassment training. Doc. 1 at ¶ 42. She also alleges that the TBC Defendants provided training to Katz Midas employees regarding automotive services, and maintained the right to inspect the Lower Burrell Midas. Doc. 1 at ¶¶ 34, 40. However, in the absence of some indication that the TBC Defendants had the ability to hire and fire Plaintiff, to control her compensation, benefits, and hours, or to promulgate work rules and assignments, the Court finds that the first factor does not support a joint employment relationship.

Regarding the second factor, day-to-day supervision of employees, the <u>Myers</u> court relied on the plaintiff's allegations that Jackson Hewitt reviewed all tax returns prepared by employees prior to filing, assisted employees with problems with tax returns and the computer system, and required that the plaintiff undergo specific training, and monitored the completion of such training. <u>Myers</u>, 679 F. Supp. 2d at 610. Here, Plaintiff does not allege that the TBC Defendants had any control over her daily work or that they had any authority to discipline her. Although Plaintiff does allege that TBC provided training to Katz Midas employees, she does not allege that she ever participated in, or could be required to participate in, such trainings. Additionally, she does not allege that she had any interactions with the TBC Defendants or their employees. In the absence of such allegations, the Court finds that Plaintiff has not established any basis for finding joint employer liability under the second factor.

Finally, with respect to the third factor, the <u>Myers</u> court relied on the plaintiff's allegation that Jackson Hewitt "assumed some degree of control over G&J employee records." <u>Myers</u>, 679

F. Supp. 2d at 610. Citing to <u>Graves</u>, the Myers court noted that, even when an alleged employer does not pay the employee's salary, that is not determinative of whether a joint employment relationship exists. <u>Id.</u> In <u>Graves</u>, the Third Circuit held that court employees, while paid by the county, were still employees of the court because the court "has the inherent right to hire, discharge and supervise" the employees. <u>Graves</u>, 117 F.3d 723 at 727. Here, Plaintiff does not allege that the TBC Defendants paid her salary or that they had the inherent right to hire, discharge or supervise her. To the contrary, she alleges that Auto Systems Centers, Inc. is the Katz-family owned entity that appeared on her paychecks. Doc. 1 at ¶ 4. Plaintiff does allege that TBC "sets guidelines and requirements regarding the manner in which Katz Midas operates its store with respect to pricing, advertising, record-keeping, operating hours, and uniforms." Doc. 1 at ¶ 39. However, this seems to refer to the franchise's financial records, and there are no allegations that TBC had any substantial control or even knowledge regarding Plaintiff's employee records including payroll, insurance, or taxes. Therefore, the Court finds that Plaintiff's allegations constitute, at best, a weak showing under the third prong.

The crux of a joint employer claim is that multiple entities exercise *significant* control over the same employee. <u>Graves</u>, 117 F.3d at 727 (emphasis added). Here, it appears that the Lower Burrell store and various Katz entities retained almost all control over Ms. Harris's employment. Plaintiff has not alleged that the TBC Defendants had any authority to: hire or fire her, promulgate work assignments, control her compensation, benefits, or hours, supervise her day-to-day work, discipline her, pay her salary, or manage her employee records. Therefore, the court finds that Plaintiff has not pled sufficient facts to demonstrate a plausible basis for joint employer liability against the TBC Defendants.

### ii. Agency and Vicarious Liability

Plaintiff also has failed to establish the TBC Defendants' liability under an agency or vicarious liability theory.

The parties agree that, in case law interpreting agency or vicarious liability in the franchise context, the decisive issue is whether a franchisor exercises control over the franchisee's business operations. See, e.g., Drexel v. Union Prescription Centers, Inc., 582 F.2d 781, 785-786 (3d Cir. 1978) ("Whether the control retained by the franchisor is . . . sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties"). In Drexel, for instance, the Third Circuit recognized that allegations that a franchisor "reserved the right to control numerous specific facets of the franchisee's business operation, ranging from the appearance and contents of the store, its advertising and promotional programs, and its accounting, inventory, and record-keeping systems, to the minimum number of weekly operating hours, the type of prescription labels and files, personnel uniforms, and the color of delivery trucks" may only "evidence [the franchisor's] concern with the 'result' of the store's operation rather than the 'means' by which it was operated." Drexel, 582 F.2d at 788-89. However, the Court found that "other provisions of the [franchise agreement] are so nebulously and generally phrased as to suggest that [the franchisor] retained a broad discretionary power to impose upon the franchisee virtually any control, restriction, or regulation it deemed appropriate or warranted," and thus created a triable question of fact regarding the franchisor's liability. Drexel, 582 F.2d at 788-89. Likewise, in Myers, the court held that the plaintiff had pled sufficient facts to establish a plausible claim for agency liability when she pled that Jackson Hewitt required G&J and its employees to submit to training, required G&J to implement a "zero

tolerance" policy for certain employee behavior, and published mandatory codes of conduct that included policies on diversity and non-discrimination.  <u>Myers</u>, 679 F. Supp. 2d at 612.  Citing <u>Drexel</u>, the court also noted the presence of a broad clause in the franchise agreement that granted Jackson Hewitt authority to promulgate policies and thereby control day-to-day operation.  <u>Id.</u>

Here, Plaintiff alleges that the TBC Defendants set guidelines and requirements regarding appearance, inventory, advertising, pricing, record-keeping, operating hours, uniforms, and quality standards.  (Doc. 1 ¶ 39).  Such allegations align almost word for word with the allegations the <u>Drexel</u> court conceded concern only the results and not the manner of the work performed.  Those allegations are common to almost all franchise agreements, and represent the kind of controls inherent in a franchise relationship.  <u>See Myszkowski v. Penn Stroud Hotel, Inc</u>., 430 Pa.Super. 315, 634 A.2d 622, 627 (1993) (holding that the franchise system controls imposed by Best Western "addresse[d] the result of the work and not the manner in which it is conducted.").  As discussed, Plaintiff does allege that the TBC Defendants provided various training to Katz employees and executives, similar to <u>Myers</u>; however, the other facts relied on by the <u>Myers</u> court as described above were not alleged in this case.  Training employees, absent more allegations of day-to-day control, is insufficient to state a claim for vicarious liability.

In sum, the Court finds that Plaintiff has not pled sufficient facts to state viable claims against the TBC Defendants, and thus will dismiss her claims against these Defendants without prejudice to Plaintiff filing an Amended Complaint.[2]

---

[2] If Plaintiff elects to amend her complaint, she may consider attaching the Franchise Agreement attached to the TBC Defendants' Motion to Dismiss.  Although the Court expresses no opinion as to whether that agreement, on the whole, supports Plaintiff's claim of joint employment and/or vicarious liability, it notes that Section 6.15 appears similar to the broad clauses discussed in

## II.    ORDER

For the reasons stated above, the TBC Defendants' Motion to Dismiss (**Doc. 7**) is GRANTED and the Defendants' Motion to Dismiss (**Doc. 10**) is DENIED.  Consistent with the foregoing, the Court hereby DISMISSES WITHOUT PREJUDICE all claims against the TBC Defendants.

If Plaintiff wishes to file an Amended Complaint, she must do so on or before August 24, 2017.  Should no Amended Complaint be filed by August 24, 2017, the Court will dismiss all claims against the TBC Defendants WITH PREJUDICE.  Defendants shall answer or otherwise respond to the Amended Complaint (or, if no Amended Complaint is filed, to the Complaint) on or before September 7, 2017.

IT IS SO ORDERED.

August 10, 2017                                                         s/Cathy Bissoon_____
                                                                              Cathy Bissoon
                                                                              United States District Judge

CC (via ECF email notification):

All Counsel of Record

---

Drexel and Myers, as it grants Midas International the authority to promulgate work policies at the Lower Burrell store.  (Doc. 7-1, Exhibit 1 at ¶6.15).