IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HANNAH HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 17-95 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| MIDAS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Pending before the Court is the Motion for Summary Judgment filed by Defendants Midas International Corporation, Midas, Inc., and the TBC Corporation, (collectively the "TBC Defendants") (hereinafter, "TBC Defendants' Motion," Doc. 64). Also pending is the Motion for Summary Judgment by all Defendants as to the alleged conduct of Defendant Trent Kight ("Defendant Kight") in Count VI (hereinafter, "All Defendants' Motion," Doc. 68). Plaintiff Hannah Harris ("Plaintiff") filed a Brief in Opposition to the TBC Defendants' Motion (hereinafter, "Plaintiff's Opposition," Doc. 72), but did not oppose All Defendants' Motion. For the reasons that follow, the TBC Defendants' Motion and All Defendants' Motion will both be **GRANTED**.

**I.      BACKGROUND**[1]

The core allegations of Plaintiff's Complaint relate to her work as a technician at the Lower Burrell Midas location ("Lower Burrell store") where Defendant Ken Shick ("Defendant

---

[1] Unless otherwise noted, the factual background is derived from the undisputed evidence of record, and the disputed evidence is viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable interferences are to be drawn in his favor.").

1

Shick") was and still is the store manager. (Am. Compl. at ¶¶ 2, 11.) Throughout her less than one year of employment at the Lower Burrell store, Harris alleged that she was "repeatedly sexually, physically and emotionally harassed, assaulted, and tortured by Defendant Shick." (Id. at ¶¶ 80–83.) In connection with this conduct, Plaintiff brings several different claims under Title VII and a claim under the Pennsylvania Human Relations Act ("PHRA") for sex discrimination (Counts I–IV, VIII) as well as tort claims, including for intentional infliction of emotional distress ("IIED") (Count VI).

The pending Motions for Summary Judgment do not relate to the heart of Plaintiff's claims, but rather ask the Court to rule on specific, narrow issues. First, TBC Defendants' Motion revisits the argument made by those Defendants in their Motion to Dismiss (Doc. 30) that they cannot be held liable in this action. Second, All Defendants' Motion asks the Court to find that they are entitled to summary judgment on Count VI as to the undisputed conduct of the district manager, Defendant Kight.[2] The Court will address each in turn.

## II.   ANALYSIS

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. See Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 172 (3d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

---

[2] Plaintiff's claim for intentional infliction of emotional distress at Count VI is based also on Defendant Shick's conduct. All Defendants' Motion does not seek summary judgment on Defendant Shick's conduct, and, likewise, this Court's Memorandum does not address any of the allegations related to Defendant Shick.

In ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000).

### A. TBC Defendants' Motion

In their Brief in Support of their Motion for Summary Judgment, (hereinafter, "TBC Defendants' Brief," Doc. 65), the TBC Defendants argue that after full development of the factual record, there is no genuine dispute of material fact as to whether liability can be imposed on the TBC Defendants as joint employers or under a theory of vicarious liability. (E.g., TBC Defendants' Brief at 2.) The Court agrees. The evidence of record demonstrates that the TBC Defendants simply did not exert control, authority, or otherwise manage the day-to-day operations and employee relationships at the Lower Burrell store to the degree required to impose liability.

#### 1. TBC Defendants are not joint employers

As discussed in the Court's Memorandum and Order on the TBC Defendants' Motion to Dismiss, (Doc. 38), a joint employer relationship may exist "when 'two entities exercise significant control over the same employees.'" Myers v. Garfield & Johnson Enters., Inc., 679 F. Supp. 2d 598, 607 (E.D. Pa. 2010) (citing Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997)). District courts within this Circuit consider three factors in determining whether a joint employment relationship exists: (1) the alleged employer's authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (2) the alleged employer's day-to-day supervision of employees, including employee discipline; and (3) the alleged employer's control of employee records, including payroll, insurance, taxes and the like. Butterbaugh v. Chertoff, 479 F. Supp. 2d 485, 494 (W.D. Pa. 2007). No single factor is dispositive and a weak showing on one factor may

3

be offset by a strong showing on the other two. Id. at 496–97. Employee expectations are also relevant to the analysis. Graves, 117 F.3d at 729.

As to the first factor, the Court previously denied Defendants' Motion to Dismiss based on allegations that the TBC Defendants: (1) had authority to promulgate workplace policies; and (2) that Plaintiff was covered by a sexual harassment policy set by the TBC Defendants. (Doc. 38 at 3–4.) The Court agrees with Defendant that, after significant discovery, the evidence does not support either of these allegations.

Regarding the TBC Defendants' ability to promulgate workplace policies, while the Franchise Agreement requires franchisees to comply with "reasonable policies, regulations and procedures," (see Doc. 25 at ¶ 55), including those related to "supervision and training of personnel" in some areas, there is no genuine dispute that the TBC Defendants did not subject the Lower Burrell store to any relevant policies. The TBC Defendants had no role in creation of the Katz Midas Employment Manual, which governed employee conduct at the Lower Burrell store. (Plaintiff's Responsive Concise Statement of Facts, hereinafter "Plaintiff's Facts," at ¶¶ 20–24.) The TBC Defendants did not provide any human resource services to any franchises. (Plaintiff's Facts at ¶ 19.) TBC Defendants had no role in dictating accrual of employee vacation time, and they did not set the days and hours of operation. (Id. at ¶ 28; Doc. 67-4 at ¶ 6.) On the second point, it is not in dispute that the sexual harassment policy that covered the conduct here was not written or reviewed by the TBC Defendants, nor did the TBC Defendants ask to see it. (Plaintiff's Facts at ¶¶ 20–24.)

In lieu of any policies the TBC Defendants actually promulgated, Plaintiff points repeatedly to the Franchise Agreement as giving the TBC Defendants the ability to do so. (Plaintiff's Opposition at 19–22.) But the broad pronouncements of the Franchise Agreement

cannot be determinative; the Franchise Agreement also expressly denies the existence of an agency relationship and gives Randolph Katz the "ultimate authority and responsibility with respect to the management and operation of Franchisee's shop." (See Exhibit 1 to Doc. 25, hereinafter "Franchise Agreement," at 6.14; id. at 6.4.) Moreover, the critical question is whether "two entities exercise significant control over the same employees" with respect to conditions of employment. Graves, 117 F.3d at 727 (collecting cases). With respect to this first factor, there is no dispute that the TBC Defendants did not actually exercise control to set policies, hire and fire, or set employment conditions.

Moving on to the second factor, Plaintiff's Amended Complaint plausibly alleged—again, based on the Franchise Agreement—that the TBC Defendants could have exercised some day-to-day control over employees at the Lower Burrell store. (E.g., Doc. 25 at ¶¶ 43, 52, 65.) This stemmed from the TBC Defendants' alleged abilities to visit and inspect the store, to train employees in the "Midas System," and to require employees to attend trainings. (Id.)

At this stage, however, the undisputed evidence shows that the TBC Defendants did not exercise any day-to-day authority at the Lower Burrell store and they did not discipline employees there. No forms used or relied upon by employees at the Lower Burrell store were created by the TBC Defendants. (Plaintiff's Facts at ¶¶ 26–28; 31–32.) The TBC Defendants had no role in handling or disposing of customer complaints about employees or any of its franchise locations. (Id. at ¶ 32.) The TBC Defendants were not asked to assist with the creation of the Katz Midas Employment Manual, which governed employee conduct in the workplace. (Id. at ¶¶ 20–24; Doc. 67-1 at 9–10.)

More to the point, it is undisputed that the TBC Defendants were not contacted by Plaintiff or the non-TBC Defendants regarding the allegations in this case at the time they came to

5

light. (E.g., id. at ¶¶ 49–59.) The Court finds this fact quite persuasive, given the conduct alleged to have occurred at the Lower Burrell store consists of threats of physical injury and an actual physical assault. If the TBC Defendants exercised authority in the areas of employee discipline and day-to-day supervision of employees, they would have been contacted by a non-TBC Defendant or by Plaintiff to address this alleged behavior.

In an attempt to avoid this conclusion, Plaintiff places heavy emphasis on the deposition testimony of Justin Machen ("Mr. Machen"), the Assistant Manager of the Lower Burrell Store. (Doc. 74-4.) Plaintiff highlights his testimony as demonstrating that the TBC Defendants "provided training to the Lower Burrell Midas employees regarding customer service and how employees should conduct themselves in the work environment." (E.g., Plaintiff's Facts at ¶¶ 18, 25, 33–37, 39, 41–42.) The Court has reviewed Mr. Machen's statements, and finds they stand for a different proposition: that the TBC Defendants provided computer training about how to answer phones, how to greet customers—that is, the training was "just all about the customer's service." (Doc. 74-4 at 3.) When asked if there was training on how employees should conduct themselves in the work environment, Mr. Machen said yes, and referenced the online classes that he previously described.

This is the only evidence highlighted by Plaintiff, and it fails to create a genuine issue on this point. For example, Plaintiff denied the TBC Defendants' statement of fact that "No Lower Burrell employees have received any training pertaining to employee relations including sexual harassment, discrimination, employee misconduct, or 'anything like that' from any of the TBC Defendants" by pointing to Mr. Machen's testimony and no other evidence. (Plaintiff's Facts at ¶ 41.) Similarly, the only evidence that Plaintiff presents to contradict the TBC Defendants' assertion that they provided "no guidance or information whatsoever as to how to handle

6

employee matters" is Mr. Machen's testimony. (Id. at ¶ 42.) Even drawing all inferences in favor of Plaintiff, Mr. Machen's statement does not provide a sufficient evidentiary basis for a reasonable jury to conclude that the TBC Defendants exercised control over day-to-day supervision and discipline of employees. Thus, this factor, too, unequivocally favors the TBC Defendants.

Finally, with respect to the third factor, at the motion to dismiss stage, Plaintiff urged a broad reading of the Franchise Agreement in support of her contention that the TBC Defendants exercised some control over employee records. (See Doc. 38 at 5.) At this stage, however, the evidence shows—just as it did with respect to the TBC Defendants' alleged day-to-day control over employees—there is no genuine dispute that the TBC Defendants did not control employee records, such as taxes, payroll or insurance. See Myers, 679 F. Supp. 2d at 610. Auto Systems paid Plaintiff, not the TBC Defendants. (Plaintiff's Facts at ¶ 7.) Plaintiff points to clauses in an Amendment to the Franchise Agreement in denying the TBC Defendants' contentions that "The TBC Defendants have never requested to review the books and records of the Katz Midas companies" (Id. at ¶ 64.) But referenced clauses are beside the point—they indicate that the TBC Defendants are notified of sales information, not "employee records, such as taxes, payroll, or insurance." (Id.)

Plaintiff has continued to rely exclusively on what the Franchise Agreement might permit, without any evidence that the TBC Defendants actually did exercise control over the employees in the Lower Burrell store in the relevant manner. See Myers, 679 F. Supp. 2d at 607. This is insufficient at this juncture. Though Plaintiff has had the opportunity to develop evidence supporting her assertions during discovery, she has failed to create a genuine issue. The Court finds that the TBC Defendants cannot be held liable as joint employers.

2. TBC Defendants cannot be held vicariously liable under an agency theory

As with its evaluation of the whether the TBC Defendants are joint employers, the Court concludes that the TBC Defendants cannot be held vicariously liable under an agency theory. The Court of Appeals for the Third Circuit has stated the relevant test as follows: "Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties." Drexel v. Union Prescription Centers, Inc., 582 F.2d 781, 786 (3d Cir. 1978).

On the latter point—the actual practice of the parties—there is no dispute. As previously recounted, Plaintiff has not shown any way in which the TBC Defendants promulgated material work rules or otherwise dictated the terms and tenure of employees at the Lower Burrell store. Therefore, the Court turns to the interpretation and construction of the Franchise Agreement to settle the issue of the relationship between the parties. Williams v. Jani-King of Philadelphia, Inc., 837 F.3d 314, 324 (3d Cir. 2016) (where only the language of an agreement is relied upon to define the relationship of the parties, "determination of the relationship was a question of law for the court.").

First, the Court notes that this is not an instance where an unsophisticated franchisee owns a single shop and requires significant support from the franchisor. The Katz family oversees Katz Midas, the largest franchisee of Midas auto locations in the world. (Am. Compl. at ¶ 32.)[3] Katz Midas owns and operates approximately 115 Midas franchises, more than 1 in 10 of the Midas

---

[3] In this case, the Managing Partner of the party identified as the Franchisee, 413 Lower Burrell Auto Center, Ltd., is Randolph Katz. (See Franchise Agreement at 21.) However, management and operation of the Lower Burrell store was delegated to Auto Systems Inc., (Plaintiff's Facts at ¶ 3) and Ian Katz is the Executive Vice President of Auto Systems Inc. (Doc. 67-1 at 3.)

franchises in the United States. (Id. at ¶ 33.) In order to do so successfully, the Katz organization established its own infrastructure to operate its franchise shops, including the Lower Burrell store. (Plaintiff's Facts at ¶ 26.) It created its own employment manual without soliciting assistance from the TBC Defendants, and the TBC Defendants did not review it or provide any guidance on it. (Id. at ¶¶ 20–24.) It has its own forms to operate franchise locations, including employment and onboarding forms. (Id. at ¶¶ 31–32.) The TBC Defendants do not assist with customer complaints, and they do not provide training on employee relationships. (Id. at ¶¶ 32–36.) Harris never interacted with any of the TBC Defendants, nor did any person affiliated with them visit the Lower Burrell store while she was employed there. (Id. at ¶¶ 56–57.)

The infrastructure supporting this vast network of Katz franchises has the effect of separating Plaintiff, an employee at the Lower Burrell store, from the TBC Defendants, the franchisor, in an unmistakable manner. All human resources and employee relationships were managed by the Katz infrastructure; Katz franchisees have never contacted a TBC Defendant about employee allegations prior to litigation, and the Lower Burrell store did not contact them regarding investigation of or discipline for the conduct in this case. (Id. at ¶¶ 50–54.) And, unlike Myers, the evidence is undisputed that Plaintiff and the other employees at the Lower Burrell store understood that the TBC Defendants were not their employers and that the workplace policies that governed their behavior was not promulgated by the TBC Defendants. (Plaintiff's Facts at ¶¶ 6–16; 19–24; 26–27.)

The sophisticated management infrastructure created by the non-TBC Defendants is consistent with where the Franchise Agreement rests control of the management of the shop: with Randolph Katz. The Section of the Franchise Agreement entitled "Managerial Responsibility" states in relevant part:

9

> [I]t is agreed that at all times during the term of this Agreement, Randolph S. Katz:
> (i) shall devote his full time and effort to the active management and operation of Franchisee's shop, (ii) shall, irrespective of any delegation of authority no inconsistent with clause (i), reserve and exercise ultimate authority and responsibility with respect to the management and operation of Franchisee's shop, and (iii) shall represent and act on behalf of Franchisee in all dealings with Midas.

(Franchise Agreement at 6.4.) Consistent with this ability to "exercise ultimate authority" in management, the Franchise Agreement also specifically disclaims an agency relationship between the parties. (Id. at 6.14.) This disclaimer, is "not dispositive of the actual existence of an agency relationship when the franchisor actually retains significant control over the franchisee's activities." Myers, 679 F. Supp. 2d at 612.

These clauses, coupled with the evidence of the actual conduct of the parties, presents an entirely different picture than Drexel. See 582 F.2d at 789–90 (Franchisor's evidence described as "'essentially conclusory' and lacking in specific facts, and of little assistance in reflecting the meaning of the control provisions of the Agreement."). While it was Defendant that made conclusory statements without sufficient evidence in Drexel, here, Plaintiff does so. As she did at the Motion to Dismiss stage, Plaintiff urges broad interpretations of the Franchise Agreement's provisions to try to create an issue of material fact. (Plaintiff's Opposition at 8–17.) At this stage, however, the Court is informed by the absence of evidence to support Plaintiff's interpretation— that the Franchise Agreement allowed the franchisor to control day-to-day operations at the store, including employee conduct.

Through this lens, even drawing all inferences in favor of Plaintiff, the Court finds that the provisions of the Franchise Agreement authorizing the TBC Defendants to retain control are not "so nebulously and generally phrased as to suggest that [the TBC Defendants] retained a broad discretionary power" over the Lower Burrell Store. Drexel, 582 F.2d at 788–89. Rather, the

control retained by the TBC Defendants relates to inherent aspects of the franchisor-franchisee relationship—such as branding and royalties—not to control over the employment relationship between Katz Midas and its workers. (TBC Defendants' Brief at 16–18.) And, "as several courts have discerned, the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship." Drexel, 582 F.2d at 786.

As an example, Plaintiff attempts to analogize Section 6.15 of the Franchise Agreement to a clause in Drexel that the Court of Appeals for the Third Circuit found was "a means of dictating the most minute details of how the outlet should run." (Plaintiff's Opposition at 8–9 (quoting Drexel, 582 F.2d at 789).) Section 6.15 reads:

> Franchisee shall at all times comply with all lawful and reasonable policies, regulations and procedures promulgated or prescribed from time to time by Midas in connection with Franchisee's shop or business, including but not limited to standards, techniques, and procedures in the installation or servicing of products or the rendering of other services, selection, supervision and training of personnel, sales, advertising, and promotional techniques, programs, and procedures relating to warranties or guarantees, payment, credit and accounting, and financial reporting policies and procedures.

Plaintiff states this gives the TBC Defendants "broad discretionary power to impose upon the Lower Burrell Midas franchise virtually any control, restriction, or regulation it deemed appropriate." (Plaintiff's Opposition at 8.) The Court disagrees.

Plaintiff's interpretation ignores the end of the Section, which states clearly that the TBC Defendants' control is in the areas "relating to warranties or guarantees, payment, credit and accounting, and financial reporting and procedures." (Franchise Agreement at 6.15.) In other words, the franchisor has retained the ability to control certain aspects of the franchisee's business in order to ensure its propriety methods are being used correctly and it is being compensated for that use. This is entirely unsurprising, and a far cry from maintaining a degree of control over employee relationships and discipline at the Lower Burrell store to trigger liability. Cf. Drexel,

11

582 F.2d at 785–86 ("Some degree of control by the franchisor over the franchisee would appear to be inherent in the franchise relationship."); see also Capriglione v. Radisson Hotels Intern., Inc., No. 10-2845, 2011 WL 4736310, at *3–4 (D.N.J. Oct. 5, 2011) (granting summary judgment to franchisor on ground that it was not liable under agency principles because it did not exercise control over daily operations or personnel matters) (applying New Jersey law); Jones v. Filer, Inc., 43 F. Supp. 2d 1052, 1057 (W.D. Ark. 1999) (granting summary judgment to franchisor because no agency relationship existed based on language of Midas franchise agreement and lack of evidence that franchisor exercised control over daily operations).

The TBC Defendants point to the deposition testimony of Ian Katz, Executive Vice President of Auto Systems Center, Inc., and of Ron Seagle, ("Mr. Seagle"), Vice President and General Manager of Midas International, as supporting this conclusion, and the Court agrees. (TBC Defendants' Brief at 16–18.) Both individuals testified that there was no aspect of the relationship between Auto Systems Centers and its employees at the Lower Burrell store, including Plaintiff, meaningfully controlled by the TBC Defendants. (Id.)

Plaintiff attempts to disputes this testimony by returning to the Franchise Agreement and urging that it creates an agency relationship.[4] (Plaintiff's Facts at ¶¶ 64–71.) Specifically, she points to clauses in the Franchise Agreement which indicate that the TBC Defendants will provide resources and assistance, that the Franchisee must report sales, and that the Franchisee must comply with the law or the Franchise Agreement could be terminated. (Id. at ¶¶ 64–69;

---

[4] In addition, Plaintiff points again to Mr. Manchen's testimony, which the Court has previously addressed. (E.g., Plaintiff's Facts at ¶ 66.) Plaintiff also indicates that the TBC Defendants' provide support to assist with operations in the areas of technical training and brand compliance. (E.g., Plaintiff's Facts at ¶ 67.) If anything, the Court finds this supportive of Mr. Seagle's testimony: the TBC Defendants set brand and quality standards for their franchisees, not standards for employee conduct.

12

Franchise Agreement at 3.1 (Midas provides support and assistance), 6.12 (comply with federal, state, and local law).) The Court does not view these provisions as supporting Plaintiff's contention that the TBC Defendants kept control of the Lower Burrell store. Cf. Green v. Independent Oil Co., 201 A.2d 207, 211 (Pa. 1964) (right to terminate agreement and alleged principal's visits to alleged agent's gas station when no "suggestions or instructions" where given during visits[5] not evidence of control). An offer to assist does not equate to an ability to control.

This is not a case where "the movant's own papers demonstrate the existence of material factual issues" rendering summary judgment inappropriate. Drexel, 582 F.2d at 786. The TBC Defendants have presented overwhelming evidence that the terms of the Franchise Agreement do not give them the control required for liability under an agency theory. Without evidence that the TBC Defendants' acted in these areas consistent with Plaintiff's interpretation, the Court cannot draw the inferences Plaintiff requires with respect to the Franchise Agreement in order to avoid summary judgment. Thus, the TBC Defendants' Motion will be granted.

**B.     All Defendants' Motion**

Every Defendant has filed for summary judgment as to the alleged conduct of Defendant Kight at Count VI. Plaintiff's claim based on Defendant Kight's conduct is rooted in three comments he made to her during her employment and a series of text messages from the night of July 8, 2016. (Brief in Support of Defendants' Motion for Summary Judgment on Count VI, hereinafter "All Defendants' Brief," at 2–3, Doc. 69.) Plaintiff did not oppose All Defendants'

---

[5] Here, the evidence is undisputed that no one from the TBC Defendants even visited the Lower Burrell store while Plaintiff worked there. (Plaintiff's Facts at ¶ 56.)

Motion. After a review of all the evidence, the Court agrees with Defendants that Plaintiff cannot maintain an IIED claim based on Defendant Kight's conduct as a matter of law.[6]

"One who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another" is liable for IIED. Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998) (quoting Restatement (Second) of Torts § 46(1))). "Only if conduct which is extreme or clearly outrageous is established will a claim be proven." Id. It is "the most egregious conduct" which triggers liability. Id. at 754 (citing several examples). In the employment context, "as a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress." Andrews v. City of Philadelphia, 895 F.2d 1469, 1487 (3d Cir. 1990).

Defendant Kight admitted that his conduct in sending the text messages was a violation of the relevant sexual harassment policy, and the Court agrees that those messages and his other comments to Plaintiff may constitute sexual harassment. (Doc. 71-1 at 7.) While sexual harassment is unacceptable in the workplace, such conduct is not actionable in Pennsylvania as IIED except in cases where the harassment constitutes the "most egregious conduct."

Defendant Kight's comments and text messages do not rise to this level as a matter of law. Cf. Mandel v. M & Q Packaging Corp., No. 09-42, 2009 WL 2579308, at *6–7 (M.D. Pa. Aug. 18, 2009) (dismissing IIED claim based on sexual comments made throughout the plaintiff's employment, an episode where a male supervisor physically threatened plaintiff, and retaliatory conduct); Kraus v. Howroyd-Wright Emp't Agency, No. 06-975, 2008 WL 90325, at *15–16 (E.D. Pa. Jan. 8, 2008) (granting summary judgment to the defendant on IIED claims where

---

[6] Because the Court finds Defendant Kight's conduct is not sufficiently extreme to impose liability for IIED as a matter of law, it does not address all Defendant's preemption arguments. (See All Defendant's Motion at 7–9.)

14

sexual advances by supervisor did not "go being all possible bounds of decency"); Hoy, 720 A.2d at 754–55 (affirming decision that "harassment includ[ing] sexual propositions, physical contact with the back of Appellant's knew, the telling of off-color jokes and the use of profanity on a regular basis, as well as a sexually suggestive picture" did not trigger liability under Pennsylvania's IIED precedents); see also Timm v. Manor Care, Inc., No. 06-152, 2006 WL 6451234, at *6 (W.D. Pa. Mar. 20, 2006) ("Courts routinely reject claims of intentional infliction of emotional distress which arise out of allegedly improper employment practices, including cases of unlawful discrimination.").

Therefore, All Defendants' Motion will be **GRANTED**.

\* \* \*

Consistent with the foregoing, the Court hereby enters the following:

The Motion for Summary Judgment filed by Defendants Midas International Corporation, Midas, Inc. and the TBC Corporation, (Doc. 64), is **GRANTED**. The Motion for Summary Judgment by all Defendants as to Count VI, (Doc. 68), is **GRANTED**.

IT IS SO ORDERED.

March 29, 2019                              s\Cathy Bissoon
                                            Cathy Bissoon
                                            United States District Judge

cc (via ECF email notification):

All Counsel of Record